Illinois. May it please the court. My name is Oscar Ray. I'm a lawyer. I work for the Pennsylvania Attorney's Office, and I'm here to present an argument on behalf of the appellants, the Pennsylvania Commissioner of Insurance, as well as Reliance Insurance Company, an admitted carrier in California. The Pennsylvania Insurance Commissioner was an intervener who was not allowed to intervene and didn't appeal her denial of intervention. So how is she here? In actuality, Your Honor, the Commissioner did also file her own notice of appeal. She did, but she never filed any briefs on the intervention. Your Honor, I believe the appeals were consolidated, and therefore – But there's no briefs on the intervention, are there? I'd say the intervention issue is embraced within the broader reverse preemption issue and the orders of the trial court. I don't see how that could possibly be. The overriding issue, of course, is jurisdiction of the trial court to do anything with this case. The appellees have argued standard intervention law, saying that there was not a basis for intervention of right. There was perhaps a predicate to deny intervention under a discretionary basis. But our contention – Whatever it is, we have no briefing on this, and I think the issue has been waived as far as I can tell. We have no briefing on it at all, on the question of intervention, on the question of whether she's present in this courtroom at all. Well, Your Honor, I would agree with you that there isn't specific briefing relative to the intervention issue. But the broader issue, of course, being jurisdiction, is what is before the court today. Can I ask you a question? You have this surety to put up a bond, right? Yes, Your Honor. What was it, 1.1 million? Exactly. So what's that got to do with your client? How does that affect your client? I can't figure that out. Well, the pendency of the litigation – I mean, here you have Hawthorne. Hawthorne. And, you know, has the claim against your client. And then the surety comes in. Puts up a bond, 1.1 million. And so how does that help? What's that got to do with your client? Are you going to get the money from the surety company? Or do you represent the surety company? The bond, the court will recall, was secured by cash. And it had to be secured by cash. The law in the Ninth Circuit is clear that those types of bonds are property of the insolvent estate. That bond and the underlying cash was property of Reliance Insurance Company. Refresh my memory. Is it your briefs that the bond is secured by cash? Yes, Your Honor. That's exactly right. So what is the Ninth Circuit law that you're relying on? I believe we cited to the court Butler v. Pacific National Insurance Company, 375 F. Second, 518 at 521 Ninth Circuit in 1967, as well as a bankruptcy case from the District Court of Arizona, NRA Legend Homes, Inc., 69, bankruptcy 799 at 800-801. That's page 30 of the opening brief of the appellants and also in the reply brief. Importantly. So how does your client get the cash? Well, Your Honor, it's interesting. The trial court in the order that came relative to the bonding issues pointed out. Talk about the money. That's what I want to know. How's your client going to get the 1.1 million? What's your plan for that? This court can enter an order, finding as it should that there wasn't a proper exercise of jurisdiction, that the orders are erroneous, and directing that the appellees pay back to Reliance Insurance Company the total sum that was paid over. In fact, the appellees made that representation to the trial court in arguing that they be permitted to keep the bond. It's, in fact, set out in one of the trial court's orders. What you mean is that the $1.1 million was actually paid to the surety or is in the hands of the surety or is the surety has a lien on it? There's nothing in the record, as far as I can tell, that explains the arrangement between the surety and your client with respect to the bond. Your Honor, I think we briefed that issue and perhaps didn't focus on it as clearly. Of course, there was a bond. The court ordered a bond. Reliance Insurance Company approached the bonding company. That bonding company required that cash be pledged. There were no other assets. Pledged meaning what? Cash belonging to Reliance Insurance Company. Meaning what do you mean by pledged? Meaning the surety essentially. Essentially that the surety. Go over there and give it to the surety? Well, essentially the surety was permitted to collect directly against the impounded funds. Essentially is what happened. Reliance had offered to pay the money into the registry of the court.  What I'm trying to find out is this, is what we ultimately have is a secured lien essentially by the surety company on this $1.1 million. There's nothing in the record that explains this as far as I know. What is it? What is the relationship between the surety company and Reliance Insurance? Is there anything in the record that shows what the actual status of this money is? I believe the judgment has been executed upon. And I know the appellees I believe have collected their $1.1 million. From the bonding company. But that doesn't have any, as Judge Pragerson began by saying, what that has to do with the liquidation proceedings is extremely unclear on this record. The connection between the bonding order as well as the surety, the cash that had to be pledged, specifically what's embraced with McCarran-Ferguson, which was an invalidation, an impairment, and a supersession of the liquidation orders, rehabilitation orders in Pennsylvania. Because Reliance Insurance Company was forced to litigate in California, they had to expend their limited resources to do that. You're not answering the question. Go ahead and argue what you want to argue. Go ahead. Well, Your Honor, I'm trying to. I'm trying to answer the question, and I apologize. You're right to the point, you know, because that bothered me on this. I mean, you know, I didn't. I'm trying to figure out what the relationship was. Well, effectively, Your Honor. Between the bonding company or the surety and. The bonding, and I don't want to leave time for you to argue the merits, but it did confuse me as to understanding what exactly this has to do with the liquidation proceeding. The bond has been executed upon, meaning that Hawthorne has gotten their money from the bonding company. All right. Now, what do we know, if anything, about how that is going to affect the liquidation proceeding? Where is the money, what is the status of the $1.1 million insofar as it affects the liquidation? That money is gone. It's not gone. So far, all we know is that the bonding company has paid it to rely on. Now, where has it gone? That's what nothing in the record explains. Well, Your Honor, I will endeavor to dig into the record a little further and see precisely what the appellees actually executed against, whether, in fact, the bonding company paid over the pledged assets. As a preliminary matter, the trial court never should have entered a bonding order in this case. They don't even know whether the bonding company paid the $1.1 million over to Hawthorne? I know that the judgment has been executed upon, and I understand that it was through the bonding company. Of course, this was the district court's central point, or one of their central points, which was that he did not regard this money as property of the estate because it could only be triggered in favor of this particular party, Reliant, and only if there was a judgment and it was going to come from the bonding company. That was his understanding. And we don't know anything else about it. It's hard to dispute that. But why don't we go to the merits? Go ahead. Your Honor, I would just say that the bonding mechanism here was essentially a fiction. At the end of the day, the only money that was going to be available to satisfy a judgment was going to come from Reliant's insurance company. Whether the bonding company paid first and then went ahead and took the cash that had been seized upon doesn't make a difference because whether the bonding company, for example, had to go through the liquidation proceeding to get its money and what priority it had and whether it had nothing but a secure lien or what, we don't know. Those issues, Your Honor, should all have been decided in the Pennsylvania Commonwealth Court. But we'd like to know what's going on. Do you understand that? Absolutely, Your Honor. I mean, you know, I've been involved in a number of these as a district judge, and I try to figure out, you know, what is the reality here? What's going on? Well, Your Honor, I will endeavor to dig into the record further and I may say that. Well, it's not in the record, so that's not going to help. I'm fairly sure it's not. But anyway, go ahead. The broad issue before the Court today is subject matter jurisdiction. And that issue is dispositive of the entire case. The broad issue is whether or not the trial court had jurisdiction in this case. If it did, whether it properly exercised that jurisdiction to effectively impound Reliance Insurance Company's assets, force it to expend limited resources to defend federal proceedings, and then proceeding to adjudicate the bank's claims against Reliance even after the Pennsylvania courts specifically ordered Reliance into rehabilitation and later liquidation under the intricate framework Pennsylvania enacted specifically for the purpose of regulating insurance companies and to fairly and efficiently liquidate insurers for the benefit of all policyholders, creditors, and the public generally. The broad theme in the briefs is that the district court here did not have jurisdiction. Why didn't it have jurisdiction? It did not have jurisdiction specifically, number one, because of reverse preemption under McCarran-Ferguson. In 1945, the United States Congress said that no statute of the United States will ever be ---- And your statute is 1332? The statute here is, in fact, the diversity of jurisdiction statute. All right. So if that's true, why isn't that true of every single insurance case removed to federal court? It's not true of every single insurance case removed to federal court because the key here, as the United States Supreme Court pointed out in the Fay decision in 1993, is whether or not we're dealing with the business of insurance, the relationship between policyholders and claimants and the insurance company. We have umpteenth diversity cases removed here between policyholders and the insurance company all the time. Nobody seems to like to stay in California court, as you didn't. You removed it, or your client did, to begin with. And according to your theory, that case should have been thrown out to begin with, quite aside from the liquidation proceedings. Is that right? Once the rehabilitation and liquidation ---- All right. Let's talk about before the rehabilitation. Why doesn't your theory also pertain before the rehabilitation? The theory that there was no jurisdiction in this case? Because of McCarran-Ferguson reverse preemption, yes. Well, first of all, we'd be in state court. It was in state court. Your reliant removed it, right? That's correct. All right. Why was there ---- why doesn't your same McCarran-Ferguson Act theory preclude that? Preclude removal? Yes. Preclude jurisdiction over the case as it was before the liquidation. In that instance, before there's liquidation, before there's rehabilitation, we do not have activation of a cohesive, detailed, complex regulatory ---- That's a different question. That doesn't ---- that's not your McCarran-Ferguson Act issue. That might be an extension issue, but it's not McCarran-Ferguson Act. That is the situation where McCarran-Ferguson has been brought to bear, where we're dealing with complex regulatory statutes, as in the Fabe case, dealing with the regulations, dealing with drilling in Texas. Once the rehabilitation and liquidation orders were entered ---- That's the Bererford case. I'm sorry? That's the Bererford case you're now talking about? I'm sorry. I apologize. You're correct. All right. That's an abstention case. You're now switching gears. You said there was no jurisdiction you began with. That's correct. All right. Well ---- That's correct. Those are the key orders, the rehabilitation orders and the liquidation orders. I don't believe McCarran-Ferguson would have applied simply because we have a dispute between alleged policyholders and policy clients. I'm asking you why not on the theory that 1332 itself is an interference with the business of insurance. Because as the courts have construed that statute, we must look to see precisely what state statute does it issue. Is there any case which is held at 13 ---- that there is no federal jurisdiction because of McCarran-Ferguson Act and 1332? In fact, Your Honor, there is. Which case is that? Your Honor, when I get up to my rebuttal, I can cite it to the court. My understanding is that the courts have looked to McCarran-Ferguson as kind of a policy and then done abstention, but there's no case that I know of that's held that there's no jurisdiction. The case is the NRA Amwes Securities case, District Court of Nebraska. All right. Is there any appellate court that has ever held this? To my knowledge, that has said McCarran-Ferguson precludes all insurance cases. No, that precludes jurisdiction over a case like this. Jurisdiction as opposed to abstention. I believe there have been cases discussing that situation. The Fifth Circuit in a relatively recent case intimated that dismissal under McCarran-Ferguson would have been obligatory, not just prudential, under a particular set of facts. McCarran-Ferguson has always been used, however, as a predicate to defer exercise of jurisdiction. Let me ask you what's really bothering me the most. Why — this is a diversity case. Why aren't we looking — and we're supposed to do essentially what a California court would do, because we're sitting as to substance anyway. The case law has — Turner from this court has sort of went up to the line but never quite said that what we really should be looking at in terms of comedy deferral, et cetera, is what a California court would do. Why isn't that right? Why are we — what we have here is an interstate problem. And if this case had stayed in California courts, we would have exactly the same problem. So why are we looking at this as a matter — I don't know how this comes out. I honestly don't. But why are we looking at it as a matter of Federal abstention as opposed to what a California court would do under these circumstances? First and foremost would be the McCarran-Ferguson Act, which applies — Let's leave aside the McCarran-Ferguson Act, please. There's no authority for it. So let's go to a comedy abstention doctrine. Why are we looking at it in terms of a — what a Federal court would do instead of what the State court that we're essentially substituting for it would do? And then I want to know what would it do. Well, I think we've briefed that issue, Your Honor, to show that — You did, and it was helpful. In California — I'd like to know — to me it's the most interesting part of the case. What would a California court do with this? A California court, from the authorities that we've cited and the analysis we've conducted, would defer to the liquidation proceedings in Pennsylvania. And what's your authority for that? Your Honor, I'll just refer you to our opening brief. We cited a number of California cases, specifically some cases also describing what constitutes a reciprocal State, being a State that enacts similar liquidation and rehabilitation proceedings, and some of the California cases thereunder, which would specifically do what they would want a Pennsylvania court to do. This is my understanding. That under the Uniform Insurance Liquidation Act, there's a provision essentially for deferral to reciprocal States. The problem is that Pennsylvania has not actually passed the Uniform Insurance Liquidation Act. So the question is, is Pennsylvania in particular, as opposed to many other States, entitled to this respect? And what is your authority in that regard? The Uniform Insurance Liquidation Act, Your Honor, in large measure, certainly the framework has been implemented in Pennsylvania. There is California authority, unfortunately unpublished, which is very recent, that says because of the similarities between the California statutes and the Pennsylvania statutes, the appropriate course is to respect the decisions in the jurisdiction of that court. So while under the Uniform Insurance ---- There's no published California authority on this, right? There's no California precedent on it? Specifically the issue of the Uniform Insurance Liquidation Act in Pennsylvania, no, there's not that we could find. But do you agree that it makes more sense to look at it through that prism rather than through this Federal court prism? That's really what I'm struggling with. I disagree, Your Honor, respectfully. And why is that? And that is because we are in Federal court. And the laws of the United States Congress are what govern here. And the decisions of the United States Supreme Court are what govern here. And so it's not simply a myopic view. They govern in the State court as well. That's correct, Your Honor. And specifically, though, McCarran-Ferguson governs in this context. It's not simply a view between California and Pennsylvania, but a view the entire. All right. Let's say we don't agree with you about McCarran-Ferguson, all right? And we're in some sort of a prudential deference kind of issue or an issue regarding the interaction of the two States, because that's really what we've got here. We don't really have a Federal. We have a Federal court sitting essentially as a State court for most purposes. And the question is, why oughtn't we to be looking at why should this case come out differently than it would have had you never removed it? Why should we be getting advantage in this case for having removed it to begin with? Well, first of all, we don't know how the case would have come to turn out. I understand that. That's the hard question. But the first question is, should we be asking that question, how would it come out if you never removed it? The question we should be asking is, does the trial court have jurisdiction? Does this court properly have jurisdiction? And under Federal abstention doctrines, was it appropriate to go forward in this case? And the Burford case provides a clear paradigm for the exercise of abstention here. Doesn't Turner say otherwise? In what respect, Your Honor? It says that Burford abstention is not available. I understand that that's an outlier case perhaps in terms of the Federal courts, but it's our case and it's precedent for us. Your Honor, certainly the U.S. Supreme Court's decision in Quackenbush, I think, resolves the issue of whether or not Burford abstention is going to be available. And it's going to be available any time there's discretionary relief that's being sought from the trial court. Here there was discretionary relief. There was a declaratory judgment action. So you're suggesting that we can ignore the Turner case? Your Honor, I don't know what particular part of the Turner case you're referring to. Sorry, not Turner. Tucker. The Tucker case. Thank you, Your Honor. The Tucker case, of course, is not an insurance liquidation or rehabilitation case. It was a Federal savings case. And therefore? Different factual circumstances. Additionally, the most important point about Tucker is the Court noted that there was not an attempt there to have a lawsuit between claimants against the bank's assets, the depositor assets. It was a collateral litigation between the bank and other claimants that would not affect the corpus that would be available for distribution in this failed savings and loan. Here we have the quintessential case for abstention because we have claimants directly against Reliance Insurance Company. Whatever monies they recover, whatever. Well, they were claimants against the bank. They were not depositors in what they were trying, but they were claimants against the bank. And these people are claimants. They're not claimants directly because of the default. In other words, this started out long before the liquidation. It's just a run-of-the-mill contract dispute. It's not that the insurance company came back and said we can't pay you because we don't have any money. They said we're not going to pay you because we don't think you're entitled to be paid. So in that sense, it's simply, it's not a case about the liquidation itself. And it started long before the liquidation. The case certainly did start long before the liquidation and rehabilitation, but rehabilitation and liquidation had to be ordered. And that was the circumstance that was presented to the trial court before any final orders had been entered, before the case had been tried, two years before the case went to the jury. Full faith and credit is another issue that I haven't really touched on here, but Pennsylvania law is clear that the rehabilitation and liquidation orders were final orders entitled to full faith and credit. The trial court should have deferred to those orders, irrespective of what it thought California might do, irrespective of what it thought about the McCarran-Ferguson Act, and it refused to. Its orders specifically noted that. In fact, that was one of the rationales. What was the final judgment that it should have been deferred to? The final judgment it should have been deferred to would have been the rehabilitation and liquidation orders under Pennsylvania law. You think those are sufficiently final orders to be entitled to full faith and credit? Under Pennsylvania law, and we've cited the authorities, they most definitely are. And there was no final judgment entitled to any preclusive effect in the California action. As the Court knows, of course, in California you don't even get preclusive effect after a jury trial. It's only until all appeals have been exhausted and no longer can the judgment be appealed that there's going to be preclusive effects. So that's another independent reason why we don't get to think about the issues of what California might or might not do. But we would suggest the weight of authority in the interest of comedy and efficient operation and regulation of insurers is to permit the domiciliary court where the liquidation is occurring to take jurisdiction, take control, and to handle it in an orderly fashion such that the banks that have been accused of fraud and defrauding a depositor may or may not get $1.1 million. Perhaps a terminally injured worker's compensation claimant might get money before they do. But that's an issue for the state policymakers. And unfortunately, in this case, it never got to that point. I see that I've gone over time. With the Court's permission, I would like to have just a few moments in rebuttal. Thank you, Your Honor. May it please the Court, and it's my pleasure to be here representing the appellees Hawthorne Savings and Hawthorne Financial Corporation, Jeffrey Titus of Body and Titus. The Court asked at the outset the question about the relationship between the bonding company and the parties here, and it is not in the record.  One is, is that the bonding company did pay Hawthorne Savings $1.1 million on the bond. The other thing that's in the record is Judge DeBrasian's statements to Reliance that its remedy, the issue is between it and the bonding company and whether the bonding company can hold on to the cash collateral that was posted. There's nothing — The cash collateral was posted before the Rehabilitation Act order and the liquidation order, right? That's correct, Your Honor. And Judge DeBrasian — So if there was an issue about it, it would have to be a sort of preference issue? In other words, it wasn't a violation of any order. It was not a violation of any order, Your Honor. It would have been a situation where the liquidator could have asserted it was a preference of some sort and made a claim against the money. And Judge DeBrasian commented on that at least once, and that is in the record. Whether Reliance did anything on that or not, the record's silent. On the issue that was raised in terms of abstention or whether this is just a State versus State case — But preference rules apply. Well, the issue would be whether, in fact, it was a payment made within a certain period of time that the liquidator would be entitled to go back and get. And I'm not going to state that I know which exact preference rules would apply. I never researched whether, in fact, Reliance would have such a claim or the liquidator would have such a claim. It was pointed out, though, by the district court. Well, isn't that kind of important? I mean, in the real world. Well, the — I don't believe it is in the sense that the bond was clearly — it was posted before the rehabilitation, and the bond was never an asset. And Ninth Circuit law does not say that the bond was an asset of the liquidating estate. We cite the Dos Cabezas case. There's also — there's other cases that we cite in our brief that say that these types of bonds are not assets of the liquidation estate. For example, this case took almost four years — The bonding company would have to get in line with the other credit. That's correct. And they took a premium. I mean, they — there is evidence in the record that they took 100 percent cash collateral. Obviously, they took a premium for whatever risk. They knew that Reliance Insurance Company was likely headed into liquidation when they posted the bond. What was their premium? I don't know. It was never — it's not something my client would know, and it's not in the record as far as I can tell. But whatever the premium was, insurance companies and bonding companies take a premium for whatever risk that they may be — that they will not be able to recover on the collateral. And that's the only thing that the district court commented on about the relationship between the parties. And never went further. Now, in terms of the reverse preemption, McCarran-Ferguson, or exclusive jurisdiction, the appellants list seven issues for the court, the first five of which assume exclusive jurisdiction in Pennsylvania. The Pennsylvania statute itself doesn't even assume exclusive jurisdiction. And I think the issue here is, since we're sitting — just like the court said, we're sitting in a diversity case on a basic California state breach of contract. It's a question of what would California do.  So, Hattie, what do we know about what California would do? To me — well, first of all, I mean, interestingly enough, although that's a comfortable approach to me, no — I'm not aware — I mean, a tucker comes closest, but I'm not aware of any federal court actually adopting that view. I mean, several of the appellate courts have said, oh, this is interesting. You know, maybe we ought to be looking at it that way, but they never do. They don't, Your Honor. I think tucker does come as close as I was able to find. But I think it's consistent with the spirit of McCarran-Ferguson, because I don't see how the diversity statute can possibly be an act of Congress that interferes with the regulation of the insurance business. And if you take that out of the equation here, the issue is, California has a state policy when it enacted the insurance code section 1616 and 1620. Pennsylvania — That's a different issue. That has to do with the bonding. But I want to know first, before we get to that — I mean, there are two questions here, are there or not. One is whether the case could go — was allowed to — should have been able to go forward at all. And the second was the bond. Before we get to the bond, we need to know whether the case should have just gone away because of the pendency of the liquidation proceeding. And the question is, what do we know about what California court would do? Now, your opponent is quite correct that in a reliance insurance case specifically, there is an unpublished California opinion, which is not precedent, which after saying that Pennsylvania is not a reciprocal state and therefore the statute doesn't require that the California procedures be suspended, nonetheless suspended is a matter of comedy. But that's an unpublished opinion. We're not bound by it. What else do we know about what California would do? Well, the reason I was raising the bond is that I think the issues are interrelated. The fact that the bond was posted and that Hawthorne was only going to collect against the bond is the reason why the case was allowed and should have been allowed to proceed because we're not going — Well, but there was a cost in coming out here and defending the case. And if — I mean, do you deny that if in fact there was — I mean, what is your position about if in fact we're looking at it through California law and if Pennsylvania was a reciprocal state, what would be California's obligation with regard to allowing the suit to go forward at all? I still think because of the bonding statute and the fact that Hawthorne was just proceeding against the bond, that the case could have proceeded and should have proceeded. And the fact — Under the Uniform Insurance Litigation — Liquidation Act. I think it still goes ahead, Your Honor. I don't think there's any case that talks about the — you know, talks about this situation where you're not — you have a set, you know, sum of money that has been put aside for the litigation. There is one case that was not cited in the briefs, the Equimed case. It's a bankruptcy case. And the site is 281 Bankruptcy Reporter 638. And in that case, there was a tentative settlement involving Reliance Insurance Company. And the parties essentially entered into a contract that said, we'll put X amount of money into the court registry. If the bankruptcy court approves the settlement, it's paid over. If not, there was going to be litigation on whether the policy should be rescinded. The liquidation then came in. The liquidator said, I'd like the money back. The Court said no. The Court said that the money was put up, just like the bond was here. It's an asset of the court. The litigation can proceed and litigate over that money that's in the court. And there's no question there's an incidental cost in defending the case here. There'd be an incidental cost, as we pointed out in our briefs and pointed out in the briefs below, to defending the case in the Pennsylvania proceeding. And it's pure speculation whether they would have paid more or less if we had taken this claim back to Pennsylvania and presented it. They would have had to determine the coverage merits there. So it's hard to say whether, in fact, there's additional cost here where they had counsel who had lived with this case, and it took a long time to get to trial, versus having to get new counsel in Pennsylvania and start from scratch, in essence. But I think the fact that the bond means that the California legislature has said that there's a strong public purpose, a strong public policy of trying to protect California insureds from out-of-state insurers who may not be able to make good on the policies that they wrote. I think that really answers the question. If a California court was faced with the situation where a bond was posted. Now, is it critical that the bond was posted first? I believe it is, Your Honor. Because I don't – I think if the liquidation had come in first, the court – it would have been different because then the court would have been asking the liquidator to post whatever collateral was necessary for the bond. What, by the way, is your understanding about whether the insurance commissioner is a party to this appeal? I don't see anything in the record either, Your Honor. The intervention was denied at the trial court. There was a notice of appeal filed by the intervener. I haven't – the issue was never briefed in the opening brief, so we didn't comment on it. And it didn't seem to have been raised particularly by the intervener. Do you want to talk a little about 1616 and 1620 since I cut you off earlier? Yeah. What I was going to say on 1616 and 1620 simply is that the purpose of the bonding statute is to protect Hawthorne. And 1620 provides that when a carrier lacked reliance, an insurance company of Illinois, surplus lines carrier, not admitted, issues a policy of insurance in this State. If it's not issued through a surplus lines broker, which is 1620A, 1620B provides in the district court's discretion if the finances and financial information show that there's some question about the solvency of the carrier, the bond – you know, the bond to be posted. All right. But then we have this complication that that company then goes – merges and the actual defendant in this case is an admitted company. Well – I'm having a hard time seeing how – I understand your policy argument. It's very – I don't understand how it works its way through the language of the statute. You know, I'll confess, Your Honor. When Judge DeVritzine issued his order, I read it many times and I wasn't certain. And then I looked again this morning. 1616, which Judge DeVritzine rule did not apply, which is the mandatory provision, refers to before any non-admitted foreign or alien insurer shall file, you know, a pleading. It talks about the insurer. The insurer at the time the district court held. We disagree, but the district court found it was the admitted carrier. 1620 has different language. It talks about in any action, suit or proceeding arising out of any such contract of insurance. The contract of insurance was issued by a non-admitted carrier. It was a policy written by a surplus lines carrier. And I think that difference in language is what Judge DeVritzine was focusing on in his order. What we have here is a contract of insurance that falls within 1620. We may not have an insurer that falls within 1616. Judge Riddle in the First Alliance matter, and that's in the record we cited her at HRE 1153, talks about this. She took the view that either one would apply. But the fact is that the merged company stepped into the shoes of the original company rather than vice versa. Colloquially, she basically said if you swallow it, you swallow it whole. And her view was that since Reliance Insurance Company of Illinois had the obligation to post and keep the bond, that when Reliance Insurance Company merged with it years after the fact, in terms of when the loss occurred, when the policy was issued, when the suit was filed, and even when the bond was posted or when the motion was filed, that it was still proper to require the bond. But 1620 focuses on the policy of insurance itself. And I think if we go back, the other problem here is that 1616 and 1620 can't be read in a vacuum. These are the protections for those policyholders in California who don't fall within the guarantee fund. And I don't think there's any question that the Illinois carrier here was not a member of CIGA and would leave Hawthorne without the normal CIGA remedy if the carrier goes under. And I think that they need to be read in conjunction in that fashion. And with that, I'll submit. Thank you. Just a few comments. The record is very clear that in 1999, Reliance Insurance Company, an admitted California insurer, became the insurer under the contracts at issue in this case. That was the insurance company by operation of that endorsement. The record is also clear that effective January of 2001, Reliance Insurance Company was the only surviving entity because the Illinois carrier was merged into. Basic principles of business law, the Reliance Insurance Company of Illinois was just not in the picture anymore. And so it really is a red herring and a diversion. But isn't the problem that the California statutes set up a system for protecting the availability of funds in the event of a judgment? And if you're right, all the protections, this would fall through the cracks of the protections. Is that accurate? I would say it's not accurate, Your Honor, because of the interstate relationship that exists relative to the regulation of insurance companies. Earlier, we were talking about the Uniform Insurance Liquidation Act. If Pennsylvania was, in fact, signatory to that act, as is California, the case law is very clear that a California state court would have to defer to the jurisdiction of the Pennsylvania court. No question. That is set forth in that statutory framework. But that doesn't have anything in particular to do with the question I'm asking you now. I'm asking you about the bonding authority. And the bonding authority doesn't depend on there being any liquidation. So let's leave the liquidation aside. Let's suppose that exactly what happened happened, but there hadn't been a liquidation. As I understand it, your position is that no bond would have been available, even though there was also no coverage by the SIGA fund because the whole contract and dispute had arisen before the merger. Is that accurate? I think the SIGA fund argument is a new argument that wasn't raised before and really shouldn't be part of these proceedings. SIGA was not argued to the trial court. My understanding is it's an interpretive aid to understanding how 1616 and 1620 interact because of understanding what the overall insurance scheme is in California for securing judgments. So I'm still asking you, am I right that on your theory, and leaving aside the liquidation, there would be, even though California in general intends to protect against out-of-state insurers who aren't able to fulfill judgments, that on your theory this would fall between the cracks and there wouldn't be any protection? I'm not saying that the statute is extremely opaque in terms of 1616 and 1620, but I just want to know what the policy implications are of what you're saying. Well, I think our argument has been and remains that under the clear language of the statute, they are inapplicable here because Reliance Insurance Company was an admitted California carrier and there was not a basis. Yes. So if a company that is as to which a bond could be required because there's no other security for a judgment is merged into a company which was admitted, but as to which the security doesn't cover this earlier contract, all of a sudden there's no security. In that order of sequence, Your Honor, I think there might be a question because in your scenario the bonding order comes first and then we have the bond. The bonding order doesn't come first. I'm saying if there was one, would have been one available with regard to the earlier, with regard to the original company, but it's now merged into the other company, all of a sudden there's no bond available and no other form of security under the California statutes. I think if the merger or the change in the insurer happens before the request for the bond comes, I think that's right. I think the answer is we look at the status of the parties at the time of the motion and that's how we determine it. We do not do a historical archaeological analysis of all the policies, all the prior insurers who was or who wasn't admitted. The California legislature could have very easily decided to cover our situation, but they didn't. The trial court here effectively wrote his own statute. And for the very clear purpose of ensuring that these particular plaintiffs got $1.1 million. Throughout the trial court's orders, he tells us specifically that's why he's doing what he's doing. But if the merger hadn't occurred, they would have been entitled to the bond. I don't think they'd be entitled to the bond either because of the policy endorsement that happens in 1999. As a matter of contract law, the admitted carrier became the insurer. And essentially a novation. All right. Before the policy endorsement, they would have been entitled to the bond. Before the policy endorsement, if we have a situation with a non-admitted carrier, I still don't believe they'd be entitled to a bond because Reliance Insurance Company of Illinois was a surplus lines carrier. But it wasn't. I don't know what this means, but it wasn't listed. It was delisted or something. It may have been delisted at some point, but the statute talks in terms of those discrete categories. It's interesting, Your Honor, that we're talking about the bond. Appellee's counsel has noted that, in fact, the bonding company got hold of Reliance Insurance Company's money. No, he did not say that. There's nothing in the record that says that. He says they paid the bond. We don't know what happened to Reliance Insurance Company's money. I understood Appellee's counsel to say that the bonding company who had those pledged assets took those assets and that at this juncture Reliance's perceived remedy is to seek a preference action in Pennsylvania. And what Appellee's counsel, whether he's accurate in terms of what the record shows or doesn't show, I think underscores the error of the trial court. It shouldn't be the commissioner of insurance in Pennsylvania trying to undo something that's already happened. It should be the plaintiffs in the first instance following the same procedures that are applicable to all insurers and all claimants all across the country that are seeking assets of this particular company that's in liquidation, essentially the equivalent of a bankruptcy proceeding. Congress was very clear that the states were to take the preeminent role in this field, and in this case we see a sidestepping of those rules. What would happen in a bankruptcy proceeding if there were a bond issued before a bankruptcy? My understanding of bankruptcy law, limited as it is, is that if the bond as this one is actually secured by the cash of the party, that that is going to be considered an asset of the debtor's estate. Importantly, the orders of the Pennsylvania Commonwealth Court weren't just limited to assets. They also spoke to all contracts. They also spoke to all pending proceedings, seeking to enjoin them, also enjoin the entry of any judgments in this case. So it's not just that we have a proceeding. It's that we have specific orders entitled to full faith and credit, which the trial court here simply refused to give credence to. Those most definitely embrace the issues here. We also have on the record a very clear case where Reliance Insurance Company moved to stay enforcement of the judgment so that its assets wouldn't be affected, and the trial court specifically denied that stay. And on the rationale, as he set out in his order, I believe it's at page record expert 272, record excerpt 272, that if he didn't permit that bond to remain, they would have to go collect, try to collect in the liquidation proceedings. Exactly. Exactly what should have happened. In this case, there has been no explanation for a broader policy reason why California banks accused of intentional fraud and misdeed should be permitted to jump ahead in line against all the other claims. At the end of the day, if we prevail in this case, it's not $1.1 million that's going to go to enrich Reliance Insurance Company. It's insolvent. It's going to be dispersed in accordance with that statutory scheme. And I think the U.S. Supreme Court, as well as the circuit courts, have been clear that insurance regulation is a special area, and it's an area where we should defer to the states. The domiciliary court here is a commonwealth of Pennsylvania. The California authorities suggest that they would defer as well, and these are issues. What California authorities are you relying on? I don't understand that. Again, Your Honor, referring back to the general authorities, talking about what a reciprocal state is under the California insurance statutes. Okay. Reciprocal state viewed as a state that has adopted similar procedures for liquidation, order, and distribution. You have no precedent. We have, of course, Your Honor, the unpublished opinion that we talked about earlier, and we just have the general. It's unpublished for a reason, which is it isn't meant to be precedent. We have the general themes. I think a lot of these issues, Your Honor, seem to be so well established that there really isn't a need to publish opinions because we're not creating them at all. That's kind of odd because I don't know why Pennsylvania hasn't joined everybody else, but they must have a reason. And they're not a reciprocal state, or at least they're arguably not a reciprocal state. They're not a state that has enacted the statute, at least. So they present a problem that most other states would not. Is that accurate? I don't know the status of other states or how they would be viewed in this context, Your Honor. So I really wouldn't venture an opinion. But certainly, we don't have the automatic deferral procedures that we would have if they were a reciprocal state. Likewise, if they were a reciprocal state under that particular Uniform Act, California could conduct its own ancillary liquidation proceedings. So there's a very orderly procedure for that. Exactly. And Pennsylvania hasn't bought into it and is now asking us to treat them as if they have. No, Your Honor. I'm simply asking that the Court put the trial court to the test set forth under McCarran-Ferguson, under full faith and credit. At the end of the day, we shouldn't be concerned so much with the result as we should be with the process, because that is what McCarran-Ferguson and reverse preemption was aimed at. Otherwise, this situation will repeat itself in Federal circuits across the country  The way I'm thinking about it now, only with respect to states like Pennsylvania that haven't passed the statute that's available that cures the problem. I disagree, Your Honor. Whether or not Pennsylvania is a reciprocal or nonreciprocal state should not affect the Federal analysis. This Court has commented that Burford abstention is particularly concerned with protecting administrative processes from undue Federal influence. That's the specific holding of Burford. And that's exactly what we have here. We have a case in equity. Important to point that out also. Request for declaratory relief. Declaratory relief that was entered and granted after the orders of rehabilitation and liquidation. We also had a discretionary granting of a bond here. Irrespective of whose property is at issue, the trial court's orders here interfered with the proper liquidation distribution of the assets for no good policy reason. In light of the authorities and our briefing, we would request that the Court reverse the judgment below. Order, as the appellees suggested they could, repay the amount that they have improperly collected. And for such other further relief as the Court may deem appropriate, we may be entitled to. But the $1.1 million was paid. The $1.1 million is gone. It's collected by the bonding company. And as I understand it, the bonding company essentially used the money Reliance had pledged in its right pocket and at its left. So Reliance's money is gone. As Appellee's counsel suggests, we should now try to collaterally attack that order somehow in Pennsylvania and bring the bonding company in under a preference action. And that just underscores why we've got the cart in front of the proverbial horse here. Well, is there a preference action that can be brought against the bonding company? I don't know, Your Honor. Those are issues that we haven't studied. And frankly, the Pennsylvania Commissioner of Insurance attempted to intervene in this case to try and explore these issues and have them adjudicated in one forum. But was denied that opportunity. And didn't appeal. Your Honor, did file a notice of appeal. But we don't know. We don't know what can or can't happen in that instance. But what are the time periods on preferences? Your Honor, just off memory, I have a vague memory that a year time period may be involved. But that is just a guess. Query what kind of situation we would create if we have a Pennsylvania court trying to undo a federal district court order ordering a bond after it's been paid upon. I think that's why this court is going to have to fashion relief for us in this case. All right. See you later. Thank you, Your Honor. The next matter, Profitt v. County of Santa Barbara. That's submitted. Now we come to Cleveland v. Well, Cedric Cleveland v. City of Los Angeles. Thank you.
judges: Browning, Pregerson, Berzon